PATRICK JOFFRION, ET AL      *      CIVIL ACTION

VERSUS      *      NO. 09-3505

JOSEPH S. TUFARO, ET AL      *      SECTION "F"


<u>ORDER & REASONS</u>

Before the Court is the defendants' Motion to Dismiss pursuant to Rule 12(b)(6).  For the reasons that follow, the Motion is GRANTED. This seems to be a case of first impression regarding the standing to sue of members of a homeowners association.


**<u>Background</u>**

The plaintiffs' case arises out of the alleged negligence, fraud, and racketeering of the defendants while associated with the Clipper Estates Master Homeowners Association ("CEMHOA"), a corporation connected with real estate development. Through such misconduct, the plaintiffs allege that defendants have violated the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968 ("RICO"), which serves as the basis for federal jurisdiction. The plaintiffs are homeowners and members of CEMHOA who have regularly paid CEMHOA assessments. Defendant Joseph S. Tufaro is the President of the CEMHOA board. Clipper Land

Holdings, LLC, controls the CEMHOA board, and defendants Tufaro and Troy Duhon are members and managers of Clipper Land Holdings as well as Clipper Construction, LLC.[1] These two companies are also defendants. Defendant Jeffery J. Neupert is the Chief Financial Officer of Clipper Land Holdings, Clipper Construction, and CEMHOA.

The plaintiffs' allegations of misconduct, and resulting damages, fall into three categories: First, the plaintiffs claim that Tufaro, and at times Neupert, diverted CEMHOA funds for the benefit of the defendants, rather than using those funds for their proper purpose of maintaining common areas or performing work for CEMHOA. The plaintiffs assert that Tufaro billed Neupert's services-$14,950 over 23 months- without identifying accounting services rendered and while employing others to render bookkeeping services. The plaintiffs further contend that Tufaro billed trash and waste services to CEMHOA for dumpsters that Clipper Construction used on properties belonging to Clipper Land Holdings. The plaintiffs submit that a total of $157,383 in payments to Clipper Construction were made without justification. Plaintiffs allege that in July 2006 Tufaro used $20,000 in CEMHOA funds to repair bulkhead failures on two lots that CEMHOA was not responsible for, including one belonging to defendant Duhon.

---

[1]Troy Duhon ceased to be a member and manager of Clipper Construction, LLC, in late April 2008.

2

Although Tufaro ultimately replaced the payment with a check drawn on Clipper Construction, the plaintiffs contend this amounts to a $20,000 interest-free loan and add that the $20,000 was never refunded. Additionally, according to the plaintiffs, Tufaro has obtained another interest-free loan from CEMHOA for $60,000 in unpaid assessments on Tufaro's lots. They also contend that at the same time Tufaro imposed a $200 special assessment on the homeowners. The plaintiffs assert that Neupert and Tufaro, in diverting funds to pay their own expenses, failed to allocate assessments for specific activities like the road reserve fund, to the designated accounts.

The second category of misconduct alleged by the plaintiffs consists of contracts that Tufaro entered into on behalf of CEMHOA that they claim were not in the best interest of the association and may have resulted in kickbacks to the defendants. Plaintiffs claim that Tufaro approved payments to Clipper Construction for repair to gates damaged by Hurricane Katrina without claiming those damages with the insurer. The plaintiffs also allege that Tufaro authorized painting services on the main gate twice, and they challenge several transactions, allegedly approved by Tufaro, for being excessively costly and entered into without a competitive bidding process. These include purchases of security equipment and landscaping products. Similarly, the plaintiffs question a trash removal contract between CEMHOA and

SDT, Inc. They point out that Tufaro rejected a cheaper proposal by Coastal Waste Services, Inc., and that a relative of Tufaro signed the contract on behalf of SDT.

The final category of misconduct alleged by the plaintiffs can be summarized as more general abuse of office by Tufaro. The plaintiffs contend that Tufaro restricted access to CEMHOA's books. Additionally, they complain that Tufaro voted in a recent board vote for properties that he owned but for which he was ineligible to vote for failure to pay assessments.

The plaintiffs claim that all actions by Tufaro and Neupert were taken with the knowledge, consent, and acquiescence, as well as for the benefit of Duhon, Clipper Land Holdings, and Clipper Construction.

The plaintiffs urge that the misconduct by the defendants demonstrates that they are (1) "person[s] who engage[d] in (2) a pattern of racketeering activity, (3) connected to the acquisition, establishment, conduct, or control of an enterprise," Crowe v. Henry, 43 F.3d 198, 204 (5th Cir. 1995), in violation of § 1962(a)-(d) of RICO. They argue that the alleged thefts amount to mail fraud and wire fraud–each offense being a "predicate act" that satisfies the pattern of racketeering requirement of a RICO claim.

I.

Rule 12(b)(6) of the Federal Rules of Civil Procedure allows a party to move for dismissal of a complaint for failure to state a claim upon which relief can be granted. Such a motion is rarely granted because it is viewed with disfavor. See Lowrey v. Tex. A & M Univ. Sys., 117 F.3d 242, 247 (5th Cir. 1997) (quoting Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc., 677 F.2d 1045, 1050 (5th Cir. 1982)). In considering a Rule 12(b)(6) motion, the Court "accepts 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" See Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit, 369 F.3d 464 (5th Cir. 2004) (quoting Jones v. Greninger, 188 F.3d 322, 324 (5th Cir. 1999)). To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." In re Katrina Canal Breaches Litig., 495 F.3d 191, 205 (5th Cir. 2007) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 569 (2007)). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Twombly, 550 U.S. at 555 (quotation marks, citations, and footnote omitted).

## II.

The plaintiffs lack standing to sue under RICO, and the Court declines to exercise supplemental jurisdiction over the plaintiffs'

state law claims.

The Fifth Circuit employs a two-part test to determine whether a plaintiff has standing to sue under RICO. First, the plaintiffs must demonstrate that they meet all applicable non-RICO standing requirements. Whalen v. Carter, 954 F.2d 1087, 1091 (5th Cir. 1992). Second, the plaintiffs must show that "the defendants' predicate acts constitute both a factual and proximate cause of the plaintiff's alleged injury." Id. This test is broader than a direct versus indirect injury test and recognizes the United States Supreme Court's requirement that damages "*flow from* the commission of predicate acts." Ocean Energy II, Inc. v. Alexander & Alexander, Inc., 868 F.2d 740, 744 (5th Cir. 1989) ( quoting Sedima, S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 497 (1985)). Where a claim is closely related to that of a shareholder suing for injuries to the corporation, the Fifth Circuit focuses on the shareholder derivative suit analysis "as a guide in determining RICO standing." Whalen, 954 F.2d at 1093 (quoting Ocean Energy, 868 F.2d at 745). This analysis requires the Court to determine "(1) whether the racketeering activity was directed against the corporation; (2) whether the alleged injury to the shareholders merely derived from, and thus was not distinct from, the injury to the corporation; and (3) whether state law provides that the sole cause of action accrues in the corporation." Id. at 1091.

The Fifth Circuit has upheld, without deciding, the use of

the shareholder derivative suit analysis to determine whether the plaintiffs had standing in a suit by the majority of a labor union's governing board against the minority that suspended them. See Adams-Lundy v. Ass'n of Prof'l Flight Attendants, 844 F.2d 245, 250 (5th Cir. 1988). "In a RICO case 'an indirectly injured party should look to the recovery of the directly injured party, not to the wrongdoer, for relief.'" Id. (quoting Rand v. Anaconda-Ericsson, Inc., 794 F.2d 843, 849 (2d Cir.), cert. denied, 479 U.S. 987 (1986)). Similarly, the First Circuit, which also uses the "flows from" analysis, has held that union members suing the president of their union chapter for misuse of union dues lacked standing under RICO because they alleged injuries suffered by the union chapter, not themselves individually. Bass v. Campagnone, 838 F.2d 10, 12 (1st Cir. 1988). The union members claimed damage to themselves because the president had misapplied over fifty percent of dues paid for his personal benefit as well as increased dues and services fees that would not have been necessary absent the defendant's actions. Id. Concluding that all of the local chapter's members had suffered precisely the same harm, the court held that these injuries were sustained by the local union, and the four members did not have standing. Id. at 12-13. The Eastern District of New York used a similar analysis in finding that a member of a non-profit organization did not have standing to sue under RICO for misappropriation of funds by

people associated with the organization because the injury was sustained by the organization. <u>Pappas v. Passias</u>, 887 F. Supp. 465, 471-72 (E.D.N.Y. 1995) ("This rule recognizes that a RICO claim essentially is an asset of the association or organization that has been injured through a violation of 18 U.S.C. § 1962, and that the prosecution of a RICO suit by a single member in his own right would impair the rights of other similarly situated members, as well as prior claimants, to this asset.")

Again, in <u>Whalen v. Carter</u>, the Fifth Circuit applied the shareholder derivative suit analysis by analogy in determining whether limited partners had standing under RICO to sue their fellow partners for mismanagement of funds. 954 F.2d at 1093. Although finding the plaintiffs lacked standing under the first two prongs of the analysis, turning to the third prong, the Fifth Circuit found that Louisiana law permits disaffected partners to sue the partner that caused injury to the partnership. <u>Id.</u> Thus, the plaintiffs had standing to sue both the mismanaging partners and those non-partner defendants who had participated in the fraud. <u>Id.</u> at 1094. However, although there is no case directly on point, it appears that no such exception applies to homeowners associations. In <u>Stall v. State Farm Fire & Casualty Co.</u>, the Louisiana Fourth Circuit Court of Appeal held that a shareholder member of a condominium association did not have standing to sue the association or its president for alleged negligence in

8

performing his duties. 995 So. 2d 670, 673-74 (La. Ct. App. 2008). The plaintiff in Stall had argued that she had not received all the insurance proceeds to which she was entitled because of a settlement agreement between the condominium association and the insurance company for hurricane related damages. Id. at 673. "Even if plaintiff suffered an indirect loss," the court wrote, "the courts have made it clear that a shareholder cannot assert an injury or loss as a separate claim; the claims must be asserted derivatively and not individually." Id. at 675.  The court of appeals did not consider whether any periodic dues paid by the member affected this outcome.

In this case, the plaintiffs allege that the defendants misused CEMHOA funds. The damages they claim under RICO are for "assessment amounts paid that were diverted for the use of the defendants and *not utilized for the maintenance of the common areas* or for work performed for other entities than the enterprise" and for "all amounts paid for contracts that were *not in the interest of the association* and for any kickbacks received by any individual defendants as a result of those contracts." (emphasis added). Essentially, the plaintiffs claim is for monies diverted from CEMHOA's treasury . . . an injury to CEMHOA, not to the plaintiffs. Plaintiffs argue that the shareholder analysis should not apply here because the plaintiffs paid regular dues and assessments, rather than an initial price for their share.

9

The Fifth Circuit has analogized the shareholder analysis to a
suit by limited partners against the partnership, Whalen, 954
F.2d at 1093, and has affirmed its use in the labor union
context, Adams-Lundy, 844 F.2d at 250. And, as the district court
in New York observed, a RICO claim for misuse of funds by
officers of an organization "essentially is an asset of the
association or organization that has been injured . . . ."
Pappas, 887 F. Supp. at 471. Similarly, even if the members of
CEMHOA are not the classic shareholder-mode claimants, this Court
is persuaded that the same analysis should be applied here. Thus,
the questions to be asked are "(1) whether the racketeering
activity was directed against the corporation; (2) whether the
alleged injury to the shareholders merely derived from, and thus
was not distinct from, the injury to the corporation; and (3)
whether state law provides that the sole cause of action accrues
in the corporation." Whalen, 954 F.2d at 1091.

Assuming the allegations are true, the defendants may well
be liable, but the plaintiffs in this lawsuit are not the proper
parties to bring suit under RICO. First, it cannot be said that
Tufaro and his associates engaged in this activity to cause loss
to the plaintiffs. Instead, the so-called unfavorable contracts,
kickbacks, and interest-free loans were directed at CEMHOA's
funds. Next, the plaintiffs injuries derive secondarily from
CEMHOA's injuries and are not distinct from them. The most direct

injuries alleged by the plaintiffs are that they had to pay more than necessary for running CEMHOA and that their properties lost value because the roads were not properly maintained. Yet even these injuries cannot be separated from the injury to CEMHOA; the association could not fulfill its obligations to its members. Lastly, Louisiana law does not provide standing for members of a homeowners association to sue the association personally for breaches of fiduciary duty by the association's officers. Instead, the plaintiffs in this suit must sue on behalf of CEMHOA if they wish to recover. See <u>Stall</u>, 995 So. 2d at 675.

Because the plaintiffs have only alleged injuries suffered by CEMHOA, the plaintiffs lack standing to sue the defendants for RICO violations. Furthermore, the Court declines to exercise supplemental jurisdiction over the plaintiffs remaining state law claims.

Accordingly, the defendants' Motion to Dismiss is GRANTED.


New Orleans, Louisiana, September 11, 2009.


MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE